UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

-vs-                                       Case No. 16-cr-20377
                                              Hon. Judith E. Levy

D-1 GREG LESTER

    Defendant.
_____

**COMBINED MOTION AND BRIEF FOR COMPASSIONATE RELEASE AND OR FOR HOME CONFINEMENT**

Now comes Defendant Greg Lester, by and through his attorney, Mark H. Magidson and in support of his Motion for Compassionate Release or for Home Confinement, states as follows:

1. Greg Lester was charged in Count One of the Indictment with violation of 21 U.S.C. §§841(a)(1), 841(b)(1)(B)(i), 846, Conspiracy to Distribute and to Possess with Intent to Distribute Heroin, and Count Two of the Indictment, violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i), Possession with Intent to Distribute 1 Kilogram or more of Heroin.

1

1. On January 4, 2017, Mr. Lester pled guilty to Count I of the Indictment and on November 2, 2017, he was sentenced to 80 months with the Bureau of Prisons.

2. His release date is October 26, 2023.

3. Mr. Lester is currently housed at FCI Morgantown a minimum-security facility that is located in West Virginia, a state that is currently undergoing a surge in the covid-19 virus. (See news blurb date June 21, 2020 from W. Virginia, Exhibit A).

4. Mr. Lester has been a model prisoner since being placed in Morgantown and has taken classes such as the drug program that has benefitted him.

5. Unfortunately Mr. Lester's health has deteriorated while being incarcerated.

6. He was diagnosed with diabetes prior to being sentenced but now the Facilities' medical staff has prescribed that he take insulin twice daily.

7. He also takes medication to reduce his high blood pressure and has to take aspirin daily to thin his blood to avoid a stroke.

8. He takes medication to control his cholesterol.

9. He is currently 52 years old and African American.

10. In short, he is a vulnerable individual with underlying medical conditions.[1]

11. As the court may recall Mr. Lester was an enigma, the paradox was that on the one hand he admitted to distributing controlled substances, yet on the other hand he worked as a funeral director for the Chlora Funeral home in Detroit. To further complicate his persona, he worked the comedy clubs in his spare time doing stand-up.

12. Mr. Lester has been in touch with Major Clora, the Executive Director of the company that operates three funeral homes, and he has been assured that there is a position for him upon his release. (See Exhibit B, letter from Major C. Clora, Jr., confirming the position of Service Attendant.)

13. Prior to his reporting to prison, Mr. Lester was living with his daughter in her home on Braille that she owned and upon his release he would again return to living with her.

14. Mr. Lester has many children and family members who are very supportive of Mr. Lester and would be able to assist him in his transition from the institution.

---

[1] Mr. Lester's medical records have been ordered from the facility but have not been received.

3

15. Because he is a member of the population that is most vulnerable (African American over the age of 50) with chronic underlying health conditions for which he is receiving medication and treatment, including diabetes, high blood pressure and Cholesterol, he is justifiably apprehensive of contracting the Covid-19 virus, which for a person like Mr. Lester, could be life-threatening.

16. Because of these factors, Mr. Lester has requested from the Warden of his facility for the relief he is seeking in this motion and while he has not received any "formal" response, he has been informed informally by staff and other inmates that such relief is not generally granted at his facility.

## LEGAL SUPPORT

17. In his motion Mr. Lester is asking in the alternative for the Court to resentence him to time served under the auspice of a "compassionate release" via 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239, or "issue a judicial recommendation for the Bureau of Prisons to transfer him to home confinement" under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 18 U.S.C. 12003(b)(2).

18. There is currently no approved vaccine or antiviral treatment for the disease, known as COVID- 19. Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, estimated that between 100,000 and 240,000 people in the United States will die from COVID-19- related complications. Michael D. Shear *et al.*, Coronavirus May Kill 100,000 to 240,000 in U.S. Despite Actions, Officials Say, N.Y. Times, Mar. 31, 2020, https://www.nytimes.com/2020/03/31/us/politics/coronavirus-death-toll-united-states.html.

19. The Centers for Disease Control and Prevention (CDC) have advised that "[p]eople (who are) older" may be at higher risk for severe illness from COVID-19. People Who Are at Higher Risk for Severe Illness, Centers for Disease Control and Prevention (Mar. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The CDC also has identified persons with certain medical conditions as being at "high risk" including hypertension and diabetes. *Ibid.*

20. On March 23, 2020, the CDC issued further guidance acknowledging that detention facilities "present [] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." Interim Guidance on Management of Coronavirus

5

Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance- correctional-detention.html.

21. Further, "the CDC noted that many detention conditions create a heightened risk [for] detainees. These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent hand washing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at 2 (E.D. Mich. Mar. 27, 2020).

22. Ordinarily, a "court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c), however, there are exceptions, and one is found in the First Step Act, (FSA) Pub. L. No. -5- 115-391, which became law in December 2018. As relevant here, the First Step Act (FSA) modified "the provisions for early release to halfway houses or home confinement that had been in place under the Second Chance Act of 2007." *United States v. James*, No. 15-255, 2020 WL 1922568, at 1 (D. Minn. Apr. 21, 2020) (citing 18 U.S.C. §

6

3624(c)(1)). That Act authorizes the BOP to place low risk prisoners in home confinement for the last six months (or ten percent, if a shorter term) of their sentence.

23. Then, on April 3, 2020, the Attorney General exercised emergency authority under section 12003(b)(2) of the CARES Act, Pub. L. No. 116-136, to expand the group of inmates who may be considered for home confinement because of the emergency conditions caused by the COVID-19 virus and its effect on prison populations. Under that guidance, "[t]he BOP began reviewing all inmates who have COVID-19 risk factors, starting with inmates incarcerated at prisons that have experienced COVID-19 cases, and similarly-situated facilities to determine which inmates are suitable candidates for home confinement." *Ibid.*

24. The FSA also allows a court to reduce the term of imprisonment "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that a reduction is consistent with applicable statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). This "compassionate release" provision allows a court to reduce a prison term "if it finds that . . .

7

extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). But that action must await a "motion of the Director of the Bureau of Prisons," or a "motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Ibid*

25. However, the exhaustion requirement has not been enforced in this and other Districts. *United States v. Haney*, No. 19-CR-541, 2020 U.S. Dist. LEXIS 63971, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020). In *U.S. v Davis*, a court in this District analyzed *Haney* as follows:

> That court examined the statutory language which gives a defendant the choice of either exhausting administrative remedies or waiting 30 days after serving his petition on the warden before filing a motion in court. With the second option, the statute allows a defendant to come to court before the agency has rendered a final decision. This demonstrates that Congress was less concerned with protecting administrative agency authority and intended that defendants have the right to a meaningful and prompt judicial determination. Therefore, the *Haney* court concluded "that Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply in the highly unusual situation in which the nation finds itself today." 2020 U.S. Dist. LEXIS 63971, [WL] at 3 (*quoting United States v. Russo*, No. 16-cr-441, 2020 U.S. Dist. LEXIS 59223, 2020 WL 1862294 (S.D.N.Y. Apr. 3, 2020)); a*ccord United States v. Atwi*, No. 18-20607, 2020 U.S.

Dist. LEXIS 68282, 2020 WL 1910152, at *3 (E.D. Mich. Apr. 20, 2020) (Michelson, J.); *United States v. Demetrious Flenory*, No. 05-80955, 2020 U.S. Dist. LEXIS 78602, 2020 WL 2124618, at *4-5 (E.D. Mich. May 5, 2020) (Lawson, J.).

[*United States v Davis*, ___F Supp 3d___; 2020 U.S. Dist. LEXIS 93436, at 7-8 (ED Mich, May 28, 2020).]

### A. Compassionate Release via 18 U.S.C. 3582(c)(1)(A)(i)

25. Mr. Lester's request for release under section 3582(c)(1)(A)(i) must be premised on "extraordinary and compelling reasons." While there are no clear guidelines for establishing those grounds, courts have applied this standard in the wake of the pandemic with the CDC guidelines in mind, accounting for both individual and institutional risk factors. In *United States v. Sawicz*, No. 08-cr-287, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020), for instance, the defendant had hypertension for which he was prescribed Lisinopril and baby aspirin. He was also housed at a facility where COVID-19 cases were reported. The defendant had only five more months to serve before being eligible for home confinement and had received permission from his unit manager to transfer to a halfway house. The district court considered *all* of these factors in determining that early release

9

was warranted.

26. In *United States v. Rodriguez*, No. 03-cr-00271, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020), the defendant was in year 17 of a 20-year sentence. He had significant health issues including, Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and liver abnormalities. He was housed at a facility with confirmed cases of COVID-19. He had a good prison record and showed improvement in prison. Notably, the district court determined that none of these factors (length of sentence, health condition, and prison record) alone were sufficient to warrant release. However, when taken together, they persuaded the court that release was warranted.

27. The common features of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that would warrant release even in the absence of a pandemic. And if the claim was not exhausted, the defendants had severe medical conditions which placed them at high risk, were housed at a facility with confirmed cases, and had served a significant part of their sentences.

28. Here, there have been confirmed cases of Covid-19 at FCI Morgantown and the virus in West Virginia is on the rise throughout the region. Mr. Lester is part of an "at risk" population, being an African male over 50 years of age with multiple serious underlying health problems. He was convicted of a drug charge which was not a violent offense and he has no history of guns or violence. He has a good prison record as one might expect from an "older" inmate with compromised health. The virus in on the up-tick in West Virginia due to lax compliance with the protocols established by the CDC. Lester has demonstrated "extraordinary and compelling reasons" to reduce his sentence to time served.

**B. CARES Act, 18 U.S.C. 12003(b)(2).**

29. On April 3, 2020, Attorney General William Barr issued the second of two memoranda addressing the rapid spread of the coronavirus in several federal prisons. That memo directed BOP authorities as follows:

> For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by

11

> transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

[Memorandum re: Increasing Use of Home Confinement at Institutions Most Affected by COVID- 19, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.]

30. The Attorney General's March 26, 2020 memorandum included the following directives for evaluating the suitability of inmates for immediate release:

> In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:
>
> The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines.
>
> The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum-security facilities.
>
> The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving

12

>
> priority treatment under this Memorandum.
>
> The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum.
>
> Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility.
>
> The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

[Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic
https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.]

31. In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement.  The memorandum noted the BOP should not grant home confinement to

inmates when doing so is likely to increase their risk of contracting COVID-19…and that the BOP should grant home confinement only when BOP has determined — based on the totality of the circumstances for each individual inmate — that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

[Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.]

32. Here, looking to the above factors, Mr. Lester meets most if not all of them:

- He is an African American male with significant underlying medical conditions that make him most vulnerable to Covid-19
- The security level at FCI Morgantown is minimum security;
- He has an excellent prison record with no major misconducts and is not affiliated with any gang activity;
- Defendant's counsel does not have Mr. Lester's PATTERN score but based upon his institutional record, his score would be the criteria of the memo;

14

- Mr. Lester has a valid re-entry plan that includes employment with his former employer and a safe home with his daughter; Michigan once the epicenter of the Midwest was fortunate to have a Governor (and a Mayor or Detroit ) who believe in science, and not buffoonery, and have controlled the spread of the virus as opposed to many states in the South who have a different agenda. As a result, he is much less likely of catching the virus in Detroit than if he remains put in West Virginia.

33. Based upon the totality of circumstances surrounding Mr. Lester, he is a candidate that should be sent home to serve his sentence.

34. On June 24, 2020 counsel for Mr. Lester contacted the two Assistant U.S. Attorneys who are listed on the register of actions as having replaced Eric Doah and left voice mail messages on their respective telephones seeking concurrence in the relief sought in this motion.

## RELIEF REQUESTED

WHEREFORE for the foregoing reasons, Mr. Lester respectfully requests that this Court Order a compassionate release or alternatively enter an order to allow him to serve the reminder of her sentence at home.

Dated: June 24, 2020

Respectfully submitted,

By: /s/*MARK H. MAGIDSON*
MARK H. MAGIDSON (P25581)
Attorney for Defendant Lester
615 Griswold, Suite 810
Detroit, MI 48226
(313) 963-4311
MMAG100@AOL.COM

## CERTIFICATE OF SERVICE

I, Mark H. Magidson, certify that on June 24, 2020, I electronically filed the above document, which resulted in the document being served electronically on all counsel of record.

/s/*MARK H. MAGIDSON*
MARK H. MAGIDSON (P25581)
Attorney for Defendant Lester